IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAH LEJECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 06cv342 |
| | ) | |
| MBH SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

September 18, 2007

Presently before the Court is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendant MBH Solutions, Inc. *(Document Nos. 18 and 19)*, and the RESPONSE in opposition filed by Plaintiff, Sarah Lejeck (*Document No. 25*).

The issues have been fully briefed and the matter is ripe for disposition. After a careful consideration of the motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Sarah Lejeck, on her claims of breach of contract and violation of the Pennsylvania Wage Payment and Collection Law. Therefore, the Court will grant the Defendant's motion for summary judgment in its entirety.

**PROCEDURAL BACKGROUND**

Plaintiff, Sarah Lejeck ("Plaintiff"), brought this lawsuit on March 15, 2006, by the filing of a Complaint against her former employer, MBH Solutions, Inc. ("MBH"), in which she alleged that MBH failed to pay her earned commissions in accordance with the company's

Commission Plan. Plaintiff alleged breach of contract (Count I), violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.* (Count II), breach of the covenant of good faith (Count III), and unjust enrichment / quantum meriut (Count IV).[1]

MBH has filed the instant motion for summary judgment in which it contends that Plaintiff's failure to establish the existence of any unpaid commissions is fatal to her claims.

## BACKGROUND

As the law requires, all disputed facts and inferences are resolved most favorable to the Plaintiff. MBH provides professional services and business consulting to companies which implement information technology products or processes. (Def's Stmt of Undisputed Facts, at ¶ 1.) On July 15, 2005, Plaintiff was offered a sales executive position with MBH at a starting salary of $80,000 and an anticipated start date of August 1, 2005. (*Id*. at ¶ 10.) MBH sent Plaintiff a copy of her 2005 Commission Plan in July 2005, which Plaintiff signed and returned to MBH the same month. (*Id.* at ¶ 32.) Plaintiff actually began working for MBH on August 29, 2005. At some point after the commencement of her employment, Plaintiff requested a revised copy of her commission plan because the Commission Plan sent to her in July 2005 did not account for the fact that her actual start date was later in the third quarter than originally anticipated. (*Id.* at ¶ 32.)

Pursuant to Plaintiff's request, in November 2005, MBH sent Plaintiff a Revised Commission Plan, which was identical to the one Plaintiff signed in July 2005 with the exception of a two-thirds reduction of the third quarter quota. (*See* Pl's Ex. 4 - Revised

---

[1] In her response to the motion for summary judgment, Plaintiff stipulates to the dismissal of her claims for breach of the covenant of good faith and unjust enrichment / quantum meriut (Counts III and IV, respectively).

Commission Plan dated November 3, 2005.) Both plans expressly identify Plaintiff's quotas and provide for the amount of commissions (as a percentage) she would receive on contract value and gross profits.

Plaintiff resigned from her position with MBH on December 15, 2005, effective December 29, 2005. (Def's Stmt of Undisputed Facts, at ¶ 30.)

### Plaintiff's Commission Plan

In 2005, MBH employed four (4) sales executives, Karen Gowe, Jim Henderson, Drew Farley, and Plaintiff, Sarah Lejeck. All four executives were paid a bi-weekly salary and were eligible to earn two separate commissions defined by the terms of their 2005 Commission Plans. Sales executives are responsible for soliciting clients who need help implementing information technology products or processes and later managing those client relationships, to make sure that MBH was paid in a timely manner, and to trouble shoot any customer situation that was not delivery oriented.

Although the sales executives had different quota requirements, which depended on their years of service and the types of contracts they sold, all four commission plans described two separate commissions that sales executives could earn: a 1% commission on the value of contracts sold which met or exceeded established quotas paid every quarter, and a 10% commission of the actual gross profits earned on contracts delivered paid monthly. (Def's Stmt of Undisputed Facts, at ¶ 37.)

### The Contract Commissions

Plaintiff's Commission Plan defines "contract value" as "1% of actual contract value closed during a calendar quarter provided: the aggregate contract value exceeds a pre-determined quarterly sales quota . . . [and] 1% commission is capped at the quarterly contract value quota." (*Id*. at ¶ 38.)

With respect to contract value commissions, Plaintiff's 2005 Commission Plan states as follows:

Commission - contract value

|  | Contract | Rate | Value |
|---|---|---|---|
| Q1 | $0 | 1% | $0 |
| Q2 | $0 | 1% | $0 |
| Q3 | $ 333,333 | 1% | $ 3,333 |
| Q4 | $ 999,999 | 1% | $ 9,999 |
| Total (capped at) | $1,333,332 | 1% | $13,333 |

(Pl's Exhibit 5.) Contract value commissions are earned at the time the contract is signed based on the contract dollar amount. (Def's Stmt of Undisputed Facts, at ¶ 40.) The Commission Plan specifically lists Plaintiff's quota for the first two quarters of 2005 at $0 because Plaintiff was not hired by MBH until July 2005.

### The Delivery Commissions

Plaintiff's Commission Plan defines "delivery commissions" as "10% of the actual gross profit (defined as net revenue less all cost of sale plus recruiters commissions)." Once MBH knows how many implementations have been delivered and the coordinating expenses

incurred, MBH can calculate its gross profit margin monthly.  Gross profit is revenue minus expenses.  (*Id.* at ¶¶ 52, 53.)  The Commission Plan Summary also states "[c]ommissions are based on actual business results."  According to the Commission Plan Summary, the 10% commission was to be paid monthly, and 30-45 days after the current month ends.  (*Id.* at ¶ 54.)  The 30-45 day window provides MBH sufficient time to calculate whether the company earned any gross profits and to determine whether any commissions are owed.  (*Id.* at ¶ 55.) Plaintiff's Commission Plan sets forth a target revenue and three alternative revenues to demonstrate how the delivery commissions are calculated.

### Relationship Between MBH and ADP, Inc.

Prior to joining MBH, Plaintiff was employed by ADP, Inc. ("ADP") from November 2002 until June 2005 as a District Manager in its Major Accounts division. (Pl's Stmt of Undisputed Facts, ¶ 9.)  MBH admits that Plaintiff was hired by MBH, in part, due to her prior employment with ADP.  Plaintiff was already familiar with ADP's projects and the services that MBH could provide to ADP.

ADP is made up of three (3) employer services divisions:  small business services, Major Accounts, and National Accounts. (Id., ¶ 9.)  MBH contracts with ADP to do the implementation with ADP's clients that ADP would normally do.  (Def's Stmt of Undisputed Facts, ¶ 42.)  Peter McCree ("McCree"), the CEO and owner of MBH, and Maryanne Moffo ("Moffo"), the Division Vice President of Business Engineering Solutions for ADP Major Accounts, have been working together on implementation delivery and operations services agreements between MBH and ADP for approximately fifteen (15) years. (*Id.*, ¶ 9.)

In April 2005, MBH entered into a professional services agreement with ADP, which outlines the terms and conditions of their business relationship.

When Plaintiff was hired by MBH, she was encouraged to "uncover opportunities" with the Major Accounts division of ADP. In September, 2005, Plaintiff contacted via telephone Jill Vitali, Vice President of Implementation with ADP, whom Plaintiff knew from her time working for ADP. (Pl's Stmt of Undisputed Facts, ¶ 15.) During this conversation, Plaintiff was made aware of the backlog experienced by ADP Major Accounts in the Chicago regional office. (Def's Stmt of Undisputed Facts, ¶ 22.) Plaintiff was able to set up a meeting with Jill Vitali, Scott Holly, Chris Morales, and Sally Loche in ADP Major Accounts in Chicago to determine what ADP needed and to discuss whether MBH could assist ADP Major Accounts in their backlog. (Pl's Stmt of Undisputed Facts, at ¶ ¶ 16, 29). Based upon this initial meeting, a second meeting occurred about a week later between Jill Vitali, Plaintiff, and McCree. Immediately following the second meeting, during which the various opportunities with Major Accounts were discussed, McCree told Plaintiff that "[w]e almost missed this one Sarah, great job." (*Id.* at ¶ 31.)

Soon thereafter, Moffo contacted McCree and explained that she had been given a budget funded through some incremental investments for outside third parties to provide implementation services to help out with the backlogs. Moffo allocated $350,000 for MBH's implementation services through June 2006, the end of ADP's fiscal year. (Def's Stmt of Undisputed Facts, ¶ 15.) The regional offices of ADP were permitted to use MBH for additional backlogs exceeding Moffo's allocation, but the regional offices would have to compensate MBH directly. (*Id.* at ¶ 16.) Once McCree agreed to work on these

implementations, Moffo contacted ADP's corporate attorneys to discuss what type of professional services agreement was necessary. The corporate attorneys advised that because of the existing Professional Services Agreement signed with MBH in April 2005, Moffo only needed to get incremental exhibits to the agreement for Enterprise e-time, HRB, and Infolink.[2] Moffo initiated Statements of Work for these three products / services.

In November 2005, additional exhibits were added to the existing Professional Services Agreement that defined the terms and conditions of work that MBH would provide to ADP Major Accounts with respect to Enterprise e-time, HRB, and Infolink. The three contracts provided that MBH would do the backlog of work for ADP's clients. (Pl's Stmt of Undisputed Facts, ¶ 43.)

Plaintiff worked with Chris Pollock, Director of Enterprise e-time for ADP, to define the terms of payment for MBH's services implementing backlogged Enterprise e-time. (Def's Stmt of Undisputed Facts, ¶ 21.) The statement of work for Enterprise e-time was completed and signed on November 28, 2005. The statement of work guaranteed MBH $150,000 in revenue; fifteen (15) implementations at $10,000 each. However, MBH only performed twelve (12) implementations under the Enterprise e-time statement of work. All Enterprise e-time implementation work for ADP Major Accounts has ended. (*Id.* at ¶¶ 24 - 26.)

The statements of work for HRB and Infolink were also completed and signed in November 2005. The statements of work for these specialty services established a fee per

---

[2]   Enterprise e-time, HRB, and Infolink are specialty services that interface with payroll systems.

implementation but did not guarantee any minimum number of implementations or revenue. (*Id.* at ¶¶ 27-28.) MBH continues to perform work on the HRB contract and is continuing to discuss additional work on Infolink with ADP. (Pl's Stmt of Undisputed Facts, at ¶ 68.)

The statements of work used for Enterprise e-time, HRB, and Infolink did not contain specific contract values. As previously stated, the Enterprise e-time contract stated that MBH would be paid $10,000 per implementation with a minimum of fifteen (15) implementations, for a guaranteed value of $150,000. The statements of work for HRB and Infolink contained a price per implementation amount; however, neither contract specified a minimum or projected number of implementations to be completed. (Def's Stmt of Undisputed Facts, ¶¶ 42 - 44.) McCree estimated the three contracts to be worth $750,000 and credited Plaintiff the entire $750,000 estimate toward her fourth quarter quota. (*Id*. at ¶ 45.) McCree derived the estimate by projecting the potential number of units for the three (3) projects over the existing ADP fiscal year, which fiscal year ended June 30, 2006. (Pl's Stmt of Undisputed Facts, ¶ 55.) The gross profit on the three contracts was calculated by using a time and materials costing basis. (*Id*. at ¶ 56.)

MBH began performing the contracted implementations in December 2005. However, the only work which generated a gross profit for the company in December was Enterprise e-time.

In mid-December 2005, Plaintiff resigned from MBH because "of the refusal of MBH to pay her the commissions owed her." *Complaint at ¶ 48.* MBH sent Plaintiff a check in January 2006 for 10% of the gross profit MBH earned on the Enterprise e-time work for the

entire month of December, despite the fact that Plaintiff resigned from MBH on December 15, 2005, effective December 29, 2005. (Def's Stmt of Undisputed Facts, at ¶¶ 58 - 60.)

### STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id*. (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

### Discussion

A.      Breach of Contract

Under Pennsylvania law, to establish a *prima facie* breach of contract claim, a plaintiff must establish the following: "(1) the existence of a contract, including its essential

terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003). According to Plaintiff, the contract allegedly breached by MBH is the 2005 Commission Plan provided to Plaintiff in July 2005 and revised in November 2005.

        1.     *Contract Value Commissions*

The plain language of Plaintiff's commission agreement defines contract value as "1% of actual contract value closed during a calendar quarter provided: the aggregate contract value exceeds a pre-determined quarterly sales quota . . . [and] 1% commission is capped at the quarterly contract value quota."

There is no dispute that the essential terms of this provision entitled Plaintiff to a 1% commission on the value of the contracts she sold from July through September 2005 where the total value of the contracts was equal to or greater than $333,333. Plaintiff was also entitled to a 1% commission on contracts she sold from October through December 2005 that were equal to or greater than $999,999. Plaintiff's total annual contract value commissions for 2005 were capped at $13,333. (*See* Pl's Exhibit 5.)

Plaintiff alleges that the "contract value commission" is "the amount that is on the contract or <u>forecasted</u> for the contract." (Lejeck Depo. at 36, emphasis added.) However, Plaintiff also testified in her deposition that the "contract value commission" referenced in her 2005 Commission Plan is determined at the time the contract is signed:

    A:    [contract value] commissions are based on one percent of booked revenue . . .

    Q:    What did you understand booked revenue to mean?

>   A: When they signed the contract.

(Lejeck Depo. at 36.)

There is no dispute that Plaintiff's claims against MBH are limited to commissions earned on the three ADP statements of work signed in November 2005, *to wit:* Enterprise e-time, HRB, and Infolink. It is also not disputed that the statements of work for Enterprise e-time, HRB, and Infolink did not contain specific contract values. The Enterprise e-time contract stated that MBH would be paid $10,000 per implementation with a minimum of fifteen (15) implementations. As such, this statement of work on its face only guaranteed $150,000 of revenue.[3]

The other two ADP statements of work contained a price per implementation amount; however neither contract specified a minimum or projected number of implementations to be completed.

Maryanne Moffo testified that she had allocated $350,000 of corporate funds to pay for MBH's services on Enterprise e-time, HRB, and Infolink implementations through the end of ADP's fiscal year in June 2006. (Moffo Depo. at 13, 17-18, 44-45, 64.) However, Moffo also testified that even her own allocation was not guaranteed because the statements of work could be cancelled if MBH did not implement in a quality fashion.

The summary judgment evidence reflects that Peter McCree estimated the three ADP contracts to be worth $750,000, which he based on the Moffo allocation of $350,000 and the

---

[3] However, as discussed *supra*, despite the language of the statement of work, it is not disputed that MBH actually performed less than fifteen (15) implementations as originally promised by ADP under the Enterprise e-time statement and that all Enterprise e-time work has ended. (McCree Depo. at 68-71; McCree Affidavit at ¶ 17; Moffo Depo. at 30-31.)

11

possibility of receiving work from the ADP regional offices.  McCree also testified that he credited Plaintiff the entire $750,000 estimate toward her fourth quarter quota.

The summary judgment record is completely void of any evidence which demonstrates that the contract value at the time the Enterprise e-time, HRB, and Infolink contracts were signed was greater than the $750,000 allocated to them by McCree.  Further, the summary judgment record lacks any evidence to show that Plaintiff exceeded or even met her fourth quarter 2005 sales quota; rather, the summary judgment record reveals that Plaintiff fell short of her fourth quarter 2005 sales quota and, thus, she was not entitled to any contract value commissions on the Enterprise e-time, HRB, and Infolink contracts.

2.   *Delivery Commissions*

The summary of the commission plan for 2005 defines delivery commission as "10% of the actual gross profit (defined as net revenue less all cost of sales plus recruiters commissions)."  (*See* Pl's Exhibit 5.)  During her deposition, Plaintiff admitted that this summary description is consistent with her understanding of the commission plan.  (Lejeck Depo. at 56.)

The implementation work performed under the three contracts at issue involved a fixed price per implementation, but MBH billed monthly for each implementation on a time and materials basis.  (McCree Depo. at 79; Moffo Depo. at 61-63.)  This allowed MBH to calculate its gross profit margin every month and provide sales executives their delivery commission within 30-45 days.

Plaintiff contends that the delivery commissions at issue were "earned" at the time the contract was signed;[4] MBH responds that the delivery commissions, if any, were "earned" at the time services were delivered. In her Complaint, Plaintiff alleges that she "understood she was to be paid upon the sale" even though the "commission plan suggests commission are to be paid upon delivery." (Complaint at ¶¶ 32-33.)

Plaintiff explained her position in her deposition as follows:

A. Okay. Well, I guess my question, I mean, really, the question is around the word delivery. You know, I delivered the business. I'm expecting to be paid for that business.

(Lejeck Depo. at 48.) Plaintiff also acknowledged that her understanding of the word "delivery" did not come from McCree or anyone at MBH. (Lejeck Depo. at 52-53.)

Also significant is that during her deposition, Plaintiff admitted the following: (i) that gross profit is determined by subtracting expenses from revenue (Lejeck Depo. at 37-38); (ii) that she understood that delivery commissions were to be based on actual business results (Lejeck Depo. at 56); (iii) that no one at MBH ever told her that delivery commissions on gross profit was to be based on an estimate (Lejeck Depo. at 58-59); and (iv) that an estimate of gross profit at contract inception could change over time, which would prevent delivery commissions from being based on "actual business results," as required by the 2005 Commission Plan.

The Court finds and rules that Plaintiff's understanding of the word "delivery" is contrary to the 2005 Commission Plan documents. Based on the unambiguous terms of the

---

[4] During her deposition, Plaintiff acknowledged that she is not seeking ongoing delivery commissions following her resignation; rather she is claiming that the entire commission, both the 10% delivery commission and the 1% contract value commission, should have been paid up front based on the signed statements of work. (Lejeck Depo. at 79-80.)

plan, the Court finds that delivery commissions could be earned only based on actual business results as determined at the time the services were delivered.

For all the foregoing reasons, the Court finds that MBH is entitled to summary judgment because Plaintiff has not produced adequate evidence from which a reasonable factfinder could conclude that MBH owes Plaintiff any delivery commissions under the terms of her 2005 Commission Plan.

B.  <u>Wage Payment and Collection Law</u>

The Pennsylvania Wage Payment and Collection law provides, as follows:

> Whenever an employer separates an employe (sic) from the payroll, or whenever an employe quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable. . . .

43 Pa. Const. Stat. Ann § 260.5(a).  Wages include "all earnings of an employe, regardless of whether determined on time, task, piece, or commission . . . ." *Id*. at § 260.2(a).  However, the Wage Payment and Collection Law does not create a right to compensation; rather, it merely offers a statutory remedy for an employer's breach of its contractual obligation to pay wages. *Sendi v. NCR Comten, Inc.*, 619 F. Supp. 1577, 1578-79 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1138 (3d Cir. 1986).  Thus, where no breach of contract occurs, there is no violation of the Wage Payment and Collection Law and summary judgment on such claim is appropriate.  *See Does v. Kohn Nast & Graf, P.C.*, 862 F. Supp. 1310, 1325 (E.D. Pa. 1994) (*citing Weldon v. Kraft*, 896 F.2d 793 (3d Cir. 1990)).

As discussed *supra,* the Court has found that at the time of her resignation, Plaintiff had earned no commissions on the contract value of the three statements of work because she had not met her quarterly quota. Further, the only work delivered in the same month as her resignation that resulted in a gross profit to MBH was Enterprise e-time work, for which Plaintiff was fully compensated. Accordingly, the Court finds and rules that MBH did not breach its contractual obligation to pay Plaintiff commissions and summary judgment is, therefore, appropriate on Plaintiff's Wage Payment and Collection Law claim.

## Conclusion

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff failed to establish the existence of any unpaid commissions under the terms of her 2005 Commission Plan. The summary judgment evidence demonstrates that the only work which generated a gross profit for MBH in December 2005 was Enterprise e-time. The record further reflects that MBH paid Plaintiff her annual salary throughout the month of December and also sent her a check in January 2006 for 10% of the gross profit MBH earned on the Enterprise e-time work through Plaintiff's last day of employment on December 29, 2005. Thus, the Court finds and rules that Plaintiff was paid all commissions she earned through the end of her employment with MBH. Accordingly, summary judgment will be granted in its entirety as to Plaintiff's claims of breach of contract and violations of the Pennsylvania Wage Payment and Collection Law.

An appropriate Order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAH LEJECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 06cv342 |
| | ) | |
| MBH SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

AND NOW, this 18th day of September, 2007, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the Motion for Summary Judgment filed by Defendant, MBH Solutions, Inc., is **GRANTED** in its entirety and judgment is hereby entered in favor of Defendant, MBH Solutions, Inc. The clerk is ordered to docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:   Joseph H. Chivers, Esquire
      Email: jchivers@employmentrightsgroup.com

      Shannon H. Paliotta, Esquire
      Littler Mendelson
      Email: spaliotta@littler.com

      Theodore A. Schroeder, Esquire
      Littler Mendelson
      Email: tschroeder@littler.com